## Oliver v. Noe.

(Decided January 14, 1930.)

ROBERT S. OLIVER for appellant.

BARRICKMAN & KALTENBACHER for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Reversing.

The appellant, W. E. Oliver, sued the appellee, Mrs. Addie C. Noe, and her husband E. D. Noe, on Mrs. Noe's promissory note for $2,000 and interest. An attachment was asked against certain property belonging to her and a lien prayed to be adjudged against the property by reason thereof. Two lienholders were made parties to the suit and called upon to set up their respective claims against this property.

Mrs. Noe set up these defenses to the notes, namely: (1) That it was without consideration; (2) that she was under the disability of coverture, and the note was executed in payment of a debt and obligation alleged to be due from her husband growing out of a contract between him and the plaintiff to which she was not a party; and (3) that the note was executed in Florida, was a contract to be performed there, and that under the laws of that state the note of a married woman is not binding upon her; and also that under the Florida law a note executed by a married woman as an attempt to bind herself or her estate for the payment of a debt of her husband or of another person is likewise void. Issue was joined on these defenses. The chancellor, after hearing the case on the merits, dismissed the petition, and plaintiff appeals.

1. We shall first dispose of the issue as to the Florida law. There was submitted to the court as the applicable law sections 1 and 2 of article 11 of the Florida Constitution, and sections 3801, 3803, and 3947 of the Revised General Statutes of that state. The sections of the Constitution provide that the property of a wife shall be her separate estate and "same shall not be liable for the debts of her husband without her consent given by some instrument in writing, executed according to the law respecting conveyances by married women," but her property may be subjected to the payment of her own obligations. Section 3801 of the statutes provides that a married woman may sell, convey, or mortgage her real property provided her husband joins therein. Section 3803 provides that to render such disposition effectual the wife must acknowledge same separately and apart from her husband as having been executed voluntarily and free from his restraint. Section 3947 is in substan-

tially the same language as the sections of the Constitution above referred to.

We are inclined to the opinion the facts justify the application of the Kentucky law (see Orr's Adm'r v. Orr, 157 Ky. 570, 163 S. W. 757; 13 C. J. 248), but whether so or not, it would seem immaterial, since it does not appear from this proof that the Florida law is materially different from the Kentucky law. If anything, the Kentucky law is stricter in protecting a married woman, for she cannot in any way become personally bound as surety or through any other form of obligation for another, but may bind her specific property through mortgage or other conveyance as security for another's obligation, while under the Florida law she may bind herself personally as well as her property by a writing executed in a manner similar to a conveyance.

2. The sufficiency of the other defenses and the correctness of the judgment rest solely upon the facts. If the obligation was in fact that of Mrs Noe and not that of her husband, she is bound under the provisions of section 2128 of the Statutes. If the original obligation, to cover which the note sued on was given, was that of her husband and she undertook to satisfy it by the execution of the note, she cannot be held liable under section 2127 of the Statutes. The burden rested upon Mrs. Noe to establish her defenses. Baskett, Nichols & Norment v. Rudy, 186 Ky. 208, 217 S. W. 112. A recitation of the evidence will demonstrate, we think, that the chancellor's conclusion is erroneous and that the plaintiff was entitled to judgment.

The substance of appellant's testimony is that he was a farmer residing in Allen county, Ky., and engaged in the "oil game" at the time of the transactions involved in this case. He first met appellee's husband when he came to his home during the summer of 1918 for the purpose of leasing his farm for oil development. It had previously been leased to one Huntsman, but it appears that Noe acquired an interest in this lease and appellant was employed in its development. Noe sold Oliver a small amount of stock in the Noethiel Oil & Gas Company, and he was given a place with that company as field manager.

Oliver had acquired an option to lease three certain farms in Logan county and approached Noe for assistance in selling or developing the leases. Noe was then

engaged in some Georgia promotions and promised to interest some one down there in the proposed project. Noe wrote him from Georgia asking that he meet him in Bowling Green; and about the first of October, 1929, Oliver met Noe, his wife (the appellee), and Walter Johnson, of Georgia, in a hotel in that city. The matter was discussed, and Noe said in the presence of his wife that he would not buy any lease but that she would, and she then and there agreed to take a one-third interest in the leases if the property suited or looked good to her husband. At this time the husband was in bankruptcy. The three men went to Logan county and viewed the property. Upon their return Mr. Noe recommended the leases to his wife, and it was agreed by them all that a well should be drilled and an expenditure of $6,000 incurred in the development. Oliver returned to Logan county and had the leases executed in the name of Johnson, Mrs. Noe and himself. These were later exhibited to Mrs. Noe and she displayed much interest in the project. Checks for the leases were given on a bank account styled "Oliver, Noe and Johnson." Johnson and Oliver each had promptly put in $1,000. It was understood that the Noes were to pay no part of the cost of securing the leases ($2 an acre), but Mrs. Noe was to bear one-third of the cost of development. Mrs. Noe and her husband told the appellant that she did not then have any ready money but would put it up later when some land notes which she owned could be collected. Oliver, as manager, proceeded to develop the property and expended more than $6,000 on the venture and obtained a dry hole.

Oliver continued his efforts to collect Mrs. Noe's share of the expenditure, visiting the Noes at their home in Louisville a time or two, but secured only promises. A short time before the note sued on was executed (January 9, 1922), he was in their home, and Mrs. Noe stated that they were going to Atlanta to try to raise some money and would pay him; that they were going to Florida to live; and that her attorney in Scottsville, W. D. Gilliam, would try to get the money on her land notes, but if he did not succeed in doing so that she would have him prepare a note and an assignment as security of some mortgage notes of the Noethiel Oil & Gas Company, aggregating $8,150, which she owned and which had been pledged to a bank in Scottsville to secure a note owed it. It appears that the Noes on their way south stopped at appellant's home in Allen county, and

that Mr. Noe requested Mr. Gilliam to prepare for his wife the note and assignment of the Noethiel notes, subject to the bank's interest, to be sent by mail to Florida for execution by Mrs. Noe. She there signed the note and assignment and it was returned directly to Oliver by mail. The Noethiel notes proved worthless, or at any rate nothing was realized on them by Oliver. Oliver frequently wrote Mrs. Noe requesting payment of the note, and in 1924 went to Miami to get a settlement, but was unsuccessful, as she claimed she was hard up.

Oliver testified that he knew that Noe was in bankruptcy and insolvent, but thought Mrs. Noe was financially able to bear her part of this venture and extended the credit to her. Throughout these transactions he recognized Mr. Noe only as the agent of his wife. Mr. Gilliam testified as to the preparation of the note and assignment, and says that he may have represented Mrs. Noe prior to this time, but did not recall any specific item of business. After this note was executed, he represented her in several matters involving oil and gas leases, in relation to some of which Mr. Noe acted as her agent. The note given the Scottsville bank secured by the Noethiel notes was that of Mrs. Noe with her husband as surety.

Johnson, the other party to the original transactions, did not testify, apparently because he could not be located.

The only evidence introduced by the appellee to sustain her defenses to this note was her own testimony. She stated that the note was her husband's and that she signed it because he asked her to do so. She had previously signed notes for him and furnished him money for his business transactions. The Noethiel notes pledged as collateral had been given her for money advanced to that company. The circumstances surrounding that transaction were that Noe had organized the Noethiel company with some Georgia friends, and was so sure of obtaining certain oil leases in Kentucky that he advertised in Georgia that the company had already acquired the leases in Allen county with producing wells, which, as she says, "was absolutely against the law, and rather than have Mr. Noe involved in anything that was not right," she sold her diamonds and Cadillac car to secure money for the first payment on the leases, which sums she gave to the company. She did not think she signed any note to the bank secured by the Noethiel

notes payable to her, but it was clearly established that she did. Mrs. Noe described her husband as "one of the most wonderful promoters that ever was operating on money from other people," but naively added, "he didn't operate with my money."

With respect to the Logan county leases and this transaction, Mrs. Noe testified that the only discussion she ever heard respecting the matter was at her dining table in Louisville; that she was never in Bowling Green but once when she called on a friend at the hotel. She never at any time authorized her husband to represent her and never agreed to take any interest in the leases. She says she never saw the leases and did not know her name was included in them. Her husband did not act as her agent in this transaction and was never authorized to do business for her in Allen or Logan county. Mr. Oliver never called upon her to pay any part of the expenses of drilling wells on this property, and she had no recollection of seeing him when they stopped in Scottsville on their way to Florida in October, 1921. She did not authorize her husband to have Mr. Gilliam prepare any note or assignment of the Noethiel notes to Mr. Oliver, but admits signing both papers. Mrs. Noe owns a home in Florida and spends her winters there and summers in Kentucky. She owns a farm in Shelby county which was conveyed to her in May or June, 1927, by "E. D. Noe, Incorporated," the stockholders of which corporation were her husband, her 19 year old son, and herself. Mr. Noe had paid $15,000 on this farm, and she paid an additional $10,000 and assumed certain mortgages. For this payment by her husband she canceled a debt owing to her by the corporation, which was organized to deal in Florida real estate. She said that she advanced money to that enterprise solely upon her husband's judgment and at his instance and request, admitting that he was her agent in those transactions. The Florida home was formerly in her husband's name, but he transferred title to her because he felt like he owed it to her, although he never said definitely why he did so. Title to the Louisville property in which they lived was in Mrs. Noe, and she sold it for $17,000 just before going to Florida.

Although denying that her husband had ever acted as her agent, and denying that she had ever been interested in any oil leases in Allen county, Mrs. Noe admitted on cross-examination that he acted as her agent

in securing the mortgage or assignment of the Noethiel leases to secure money advanced by her, and that she made that loan on his recommendation. It is shown also by the records that there were other leases held by her in Allen county.

Taking the evidence as a whole, with the reasonable probabilities, we are of the opinion that Mrs. Noe is liable under her commitment. The statute (section 2127) is clear and mandatory that a wife cannot become personally bound for any obligation of her husband even though she execute a note to cover it. Brady v. Equitable Trust Co., 178 Ky. 693, 199 S. W. 1082. But she is clearly responsible for her own obligations. Scott v. First National Bank, 221 Ky. 297, 298 S. W. 949. The difficulty usually arises in determining whether the debt or liability for which a wife has undertaken to obligate herself is that of her husband or herself. Her liability under a contract may, of course, arise through the husband as her agent. Tompkins v. Triplett, 110 Ky. 824, 62 S. W. 1021, 96 Am. St. Rep. 472; Memhard v. Alfred Gabrielson Co., 224 Ky. 238, 5 S. W. (2d) 1070. According to the evidence supporting appellant's claim, the wife not only personally entered into the contract for the acquisition and development of the Logan county leases, but participated in the venture through and by her husband as her agent. It stands out prominently that he was insolvent and known to be such by the appellant, while the wife claimed to be and was actually the owner of property of value; that she was engaging in the oil business by the acquisition of leases, the advancement of money to another company, borrowing money from the bank, and pledging her securities. It is significant that she alone signed the note covering the obligation some time after it was incurred. She says that her husband was promoting enterprises with other people's money. She was a woman of affairs and frequently accompanied him into the oil fields and other places where his business called.

Without further analysis of the evidence, we may say the appellee failed to sustain the burden of showing that the credit was extended by the appellant to her husband rather than to herself. See Baskett Nichols & Norman v. Rudy, 186 Ky. 208, 217 S. W. 112. The note sued on was her independent contract, founded upon a substantial consideration, to wit, her agreement to acquire and develop the oil leases, and not founded upon

a pre-existing obligation of her husband. Tompkins v. Triplett, supra; Swearingen's Executor, etc., v. Tyler, 132 Ky. 458, 116 S. W. 331; Scott v. First National Bank, 221 Ky. 297, 298 S. W. 949. If the case should be determined by the law of Florida, the result would be the same. See Nadel v. Weber Bros. Shoe Co., 70 Fla. 218, 70 So. 20, L. R. A. 1916D, 1230.

It is the invariable rule of this court not to reverse a judgment of the chancellor where the decision is dependent upon the credibility of opposing witnesses, or where the evidence is such as to make doubtful the truth of the matter involved. Yet the rule is equally uniform that the court will weigh and judge the sufficiency of the evidence for itself, and where it is convincing the one way or the other, and it is apparent that the chancellor has erred in his conclusion, the judgment will be reversed. Smith v. Boone, 222 Ky. 1, 299 S. W. 1059. We are constrained to apply that rule in this case and to reverse the findings of the chancellor, as this court is clearly of the opinion that the plaintiff was entitled to judgment on the note.

Judgment reversed.